15195

LEE *ET AL.* v. COLUMBIA RAILWAY & NAVIGATION CO.
*ET AL.*

(12 S. E. (2d), 741)

March, 1940.

*Messrs. Benet, Shand & McGowan,* for appellant,

*Messrs. J. B. S. Lyles* and *P. A. Cooper,* for respondents,

January 3, 1941.

The opinion of the Court was delivered by MR. CHIEF JUSTICE BONHAM.

At the argument of this case counsel for appellant said: "The history of this case and the events which led to the litigation is a fascinating story." This is true. The history has its origin in the action of the State which led to the charter for the old Santee Canal, which was completed about 1803. The purpose of that canal was to improve navigation along Congaree, Wateree, Santee and Cooper Rivers, to and from Charleston and Georgetown. When improved means of transportation, and financial and economic conditions, rendered the use of the old canal unnecessary, it sank into what Mr. Cleveland has styled "a state of innocuous desuetude."

Major Thomas B. Lee was a civil engineer of ability and experience, especially in the line of surveying and building railroads. He had also had some experience in deepening and widening the Columbia Canal. For years his attention had been attracted to the question of the feasibility of connecting the waters of the Santee and Cooper rivers for navigation, irrigation purposes and for the development of electric power. He had made preliminary examinations and had some maps and profiles of the terrain, and had made surveys on behalf of a corporation in Charleston for the purpose of developing a canal between Santee and Cooper rivers, with a view to producing power for use at Summerville, S. C. This project was abandoned.

The Columbia Railway & Navigation Company was incorporated in November, 1913, with G. A. Guignard and T. C. Williams as its only stockholders, with Guignard President and Williams Vice-president, and C. G. Guignard Secretary. The purpose of this organization was to construct and operate a railroad from Columbia for a distance of three miles south on Congaree River, and from there to operate boats to Charleston and Georgetown and intermediate points. This project was in operation when Major Lee approached Mr. Guignard with the suggestion of uniting the waters of Santee and Cooper Rivers by a canal, which would be advantageous to the navigation purposes of the said Railroad & Navigation Company, and also advantageous in the use of the waters for the production of electricity. The negotiations between the parties resulted in the making of a written contract, of date April 10, 1917. Around this instrument of writing cluster the interests and issues involved in this case. It is well that we have it at hand for ready reference, hence, we set it out here:

"Whereas, Major Thomas B. Lee has certain information, maps, estimates, and engineers' reports of a canal connecting the Santee and Cooper Rivers for the purpose of navigation and the development of hydro-electric power, and,

"Whereas, Major Lee is desirous that the necessary rights of ways along the line of this canal be secured, and that the approval of the Chief of Engineers of the War Department and the necessary consent of the Congress of the United States be obtained. Now, therefore, the following agreement witnesseth:

"The Columbia Railway & Navigation Company agrees to begin immediately the work of securing the necessary rights of ways and to press the same vigorously until all the necessary rights of ways, easements, etc., are obtained, and to proceed at once to do whatever may be necessary or essential to the work of securing the approval of the Chief of Engineers of the War Department of the United States and the consent of the Congress of the United States to the carrying out of the project and to the diverting of one-half, if so much be necessary, of the natural flow of the Santee River into the Cooper River, and to the construction of the necessary works to the carrying out of the project.

"Second: That the Columbia Railway & Navigation Company further agrees to pay all expenses incident to the performance of their part of this contract and that no part of the said expenses shall be borne or paid for by Major Lee other than the turning over to the said Columbia Railway & Navigation Company, such information, maps, etc., as he already has.

"Third: The Columbia Railway & Navigation Company agrees that Major Thomas B. Lee shall hold the position of Engineer in Chief of the project and that no other engineers shall be employed to do any work in connection with the project without the consent and approval of Major Lee, and that for his services as Engineer in Chief he shall be paid out of the funds received from the sale or during the development of the canal a reasonable salary to be agreed upon.

"Fourth: The Columbia Railway & Navigation Company agrees that in the event of the sale of the property and franchises Major Lee shall receive as his compensation for

the information turned over to the Columbia Railway & Navigation Company one-tenth of the gross amount received from such sale, and in the event the Columbia Railway & Navigation Company or its associates shall develop the said canal the value of the property before development shall be determined by appraisement and Major Lee shall receive in money or other valuable considerations one-tenth of the value of said appraisement. The said moneys or other valuable considerations acceptable to Major Lee shall be turned over to him prior to the beginning of the work of development.

"Fifth: The intent of this contract agreed to by the Columbia Railway & Navigation Company and Major Thomas B. Lee is that Major Lee shall receive a one-tenth interest in the proposition and shall not be called upon to pay any portion of the expenses incident to carrying out the project, and the said one-tenth interest of Major Lee is non-assessable and in case of a sale of the property, or any part thereof, the one-tenth interest of Major Lee shall be first paid over to him before the Columbia Railway & Navigation Company shall receive any moneys either for expenses to which it has been put or profits accruing to it.

"This agreement shall be of no force either in law or in equity if the Columbia Railway & Navigation Company shall not begin within ten days to prosecute vigorously to completion its obligations aforesaid.

"Witness our hands and seal this 10th day of April, 1917.
"Columbia Railway & Navigation Company.
"(Signed)  By G. A. Guignard
"President."

In 1918, there was a survey by F. H. Haskell along the line proposed by Major Lee. In 1918, Major Lee and Mr. T. C. Williams went to Washington and saw Senator Tillman, who advised that they wait, before doing anything about the Santee matter, until the legislation then pending in Congress, to create the Federal Power Commission, had

passed. They acted upon this advice. Mr. Williams states that they then proposed an application for a preliminary plan. In 1919, Mr. Verrill, a government engineer, made a survey to determine the water supply of the river. In September, 1921, a preliminary permit was granted by the Federal Power Commission. In September or October, 1921, Lockwood, Green & Company were engaged to start a survey of the project; they filed their report in April, 1922. Major Lee died March 13, 1922. In August, 1922, Randolph, Perkins & Company made a report on the project. In 1923, an engineer named J. O. Wright made a report on the project. In April, 1923, the Foundation Company of New York was engaged to investigate the project under a contract with Columbia Railway & Navigation Company. In March, 1925, Murray & Flood, engineers, made a report on the project, which they had been engaged to do. In July, 1926, Mr. G. A. Guignard died. April 2, 1926, the Federal Power Commission issued its license to the Railway & Navigation Company. On February 25, 1928, Murray & Flood sold and conveyed to International Land Corporation the stock of Columbia Railway & Navigation Company, which they had previously purchased, by acquiring the half owned by T. C. Williams and the other half owned by the estate of G. A. Guignard. This sale carried the license granted by the Federal Power Commission to Columbia Railway & Navigation Company to construct a canal connecting the waters of the Santee and Cooper Rivers for the purposes therein named. The price paid for the capital stock of Columbia Railway & Navigation Company was $182,790-.00. In December, 1928, work began on the development of the project. April 13, 1939, sale of the project to the Public Service Authority was consummated.

This action was begun by T. B. Lee, as administrator *cum testamento annexo* of the estate of Thomas B. Lee, deceased, and Catherine T. Lee, the widow of Thomas B. Lee, against Columbia Railway & Navigation Company, Santee-

Cooper Engineering & Construction Company and South Carolina Public Service Authority.

The complaint is for the enforcement of the claim of Mrs. Catherine T. Lee, as sole beneficiary under the will of Thomas B. Lee, of ten per cent. of the purchase price paid the Columbia Railway & Navigation Company by the South Carolina Public Service Authority for its rights and properties constituting the project, which was in the gross sum of $470,543.38. The complaint demanded judgment for $47,054.35 and interest at the rate of six per cent. from April, 1939.

The South Carolina Public Service Authority and the Santee-Cooper Engineering & Construction Company were, in the course of the trial of the case, duly dismissed as defendants and no longer figure herein.

The answer of the defendant set forth that Major Lee did not perform his part of the contract, hence, there was a total or partial failure of consideration that the Federal Power Commission license secured by the defendant was based on a plan conceived and developed after Major Lee's death, and is a type never contemplated by Major Lee, nor proposed in any information, maps, profiles or anything furnished by him; that there were personal services to be performed by Major Lee which were not performed before his death, and the performance of which could not be done after his death. It also pleads the six-year statute of limitations. Appellant denies the right of plaintiff to any part of the sum paid by the Authority to defendant for the reason that because of the failure of Major Lee to perform his part of the contract, this defendant incurred heavy expenses in surveys, maps, plans, etc., for which defendant was obliged to pay, so that when these expenses are deducted from the amount paid by the Authority, there is little left.

The matter was referred to the Master for Richland County to take the testimony and report thereon. Upon the report of the Master, the matter came on to be heard in the

Circuit Court by Hon. Philip H. Stoll, presiding. On March 12, 1940, he filed his decree, by which he held that plaintiff was entitled to recover of defendant the sum of $47,054.35 together with interest at the rate of six per cent. from the 15th day of May, 1939.

From this decree the defendant appeals upon 29 exceptions. Under the view which we take of this appeal, it will not be necessary to consider these exceptions *seriatim*; but in the disposition which we make of the case all the vital issues made by the appeal will have been considered.

The learned Circuit Judge holds categorically that Major Lee in good faith did the things expected and required of him. In other words, he holds that Major Lee fully performed his part of the contract of April 10, 1917. In this finding we cannot concur. This necessitates an analysis of the terms and provisions of the contract, and of the evidence pertinent to this issue.

The Columbia Railway & Navigation Company was engaged in the operation of a railway from Columbia, South Carolina, to Granby, three miles south of Columbia on the Congaree River, connected with a line of steamers which plied the waters of the Congaree and Santee Rivers from Granby to Charleston and Georgetown. This was the sole business of the corporation, which for the sake of brevity we may call the Navigation Company. Mr. G. A. Guignard was its president. His home was across the Congaree River at or near old Granby, in Lexington County. He had owned Dreher Shoals on Saluda River, with other water rights on that stream, and lands adjacent thereto, which he had sold to persons whose successors were engaged in developing that property, and whose labors culminated in the huge dam and lake known as Lake Murray, some miles west of Columbia. This project is engaged in generating and distributing hydro-electric power. Doubtless Major Lee, who was an engineer of fine ability and large experience, knew of Mr. Guignard's interest in developments of this character. At any rate, he approached Mr. Guignard with the idea of

combining his ideas and plans, for a canal to connect the waters of the Santee and Cooper Rivers, with the Columbia Railway & Navigation Company in a project to construct the proposed canal. We have no minutes or records of the negotiations between them further than the contract which they made on April 10, 1917.

By the terms of this contract the Navigation Company bound itself "to begin immediately to obtain the rights-of-ways, * * * and to do whatever may be necessary or essential to the work of securing the approval of the Chief of Engineers of the War Department and the consent of the Congress of the United States to the carrying out of the project and to the diverting of one-half" of the water. The contract further provides that it shall be "of no force * * * if the Columbia Railway & Navigation Company shall not begin within ten days to prosecute vigorously to completion its obligations aforesaid."

It passes the bounds of credibility that Mr. Guignard, a man of large business experience, engaged in large enterprises, involving large expenditures and the exercise of a keen and sound judgment, would have entered into such a contract unless he was convinced by the showing made by Major Lee in the negotiations, that the Major had a well-defined plan of the proposed project upon which to base the work to which Mr. Guignard bound his company. We can conceive of no other reasonable inference or deduction from the provisions of the contract.

Did Major Lee have such well-defined plan or plans of his proposed project? Let us take the testimony thereabout of T. C. Williams, a stockholder and vice-president of the Navigation Company, and the principal witness for plaintiff. At folio 151 of the record we find:

"A. Major Lee stated to me a number of times at the conferences that the short straight line canal as was feasible between the Santee River and the Cooper River provided no storage in either the Santee River or the Cooper River

and I disagreed with him, I didn't think that practicable * * *."

On cross examination he said; folios 189-191:

"Q. That was a gravity canal without storage, was it not? A. Major Lee never admitted that storage was necessary to me.

"Q. His plan didn't contemplate storage? A. None, that was the main difference between Major Lee and I.

"Q. You thought it was proper and he didn't think so? A. I thought it was absolutely essential.

"Q. As a matter of fact the present plan of the Santee-Cooper development contemplates a large reservoir between the Santee and the Cooper, does it not? A. Very large.

"Q. None of Major Lee's plans contemplated a storage reservoir between the Santee and Cooper Rivers? A. They did not."

Again, at page 49 of the Record:

"Q. So the line run on Major. Lee's bench mark and directions to Mr. Haskell was not the line which was afterwards picked out as the canal line? A. No.

"Q. As a matter of fact didn't it afterwards develop that the directions and marks that Major Lee was relying on and directed Mr. Haskell to proceed on were made in 1825 from a map? A. I think Major Lee in his studies had used probably Mills' Atlas and he failed to take account of the variations of the compass."

Page 53 of the Record, Mr. Williams again on cross examination:

"Q. Major Lee resented Lockwood Green being brought in, did he not? A. Major Lee called the Yankee engineers longhorns; he thought he knew more about local conditions."

At page 54 of the Record:

"Q. You wrote this letter to Mr. Guignard? A. I did.

"Q. I will read you part of it: 'Before we can enter into serious negotiations with anyone, either with the view of selling or of constructing the canal, we must have something to figure on, and I don't think it would be safe to ever con-

sider the estimate of Major Lee. I am satisfied that if you will go. with me to Charleston and have a talk with Major Young we will get more useful information than we will ever be able to get from Major Lee,' that was the letter, was it not? A. Yes.

"Q. That is a correct statement? A. I told you I differed with Major Lee on the engineering features. * * *

"Q. From your standpoint was that or not a correct statement when you made it? (part of letter read again). A. I don't say his survey was of no value and I didn't say that all of his studies were not of value—I didn't say in that letter nor have I ever thought that Major Lee's surveys, his studies and his plans were of no value but in arriving at the cost of the project, as I could see it, Major Lee's estimates would be of no consequence to me in that feature. * * *

· "Q. Then he had no such survey as would enable him to make an estimate of the costs? A. Not that I knew of."

Further from Mr. Williams, page 61:

" * * * didn't you and Mr. Guignard go up there and tell Major Lee that his plan was not feasible for an economic development? A. I don't think I did, I recall very distinctly when I insisted that without storage we would have absolutely no permanent power getting up and walking out of Mr. Guignard's parlor and I heard Major Lee say as I walked down the hall, he is a damn fool talking about storage with all the water in that big river, I listened but said nothing, Major Lee was very much older than I and I just had patience.

"Q. Is it still your opinion that storage is necessary? A. I think it is necessary.

"Q. The present location contemplates very large storage? A. One hundred and thirty-seven thousand acres under water, with billions of cubic feet of water in storage."

It is evident from the testimony of Mr. Williams that the plans of development finally adopted are different from any proposed or thought of by Major Lee. We have quoted so much of the testimony of Mr. Williams because he was

a witness for plaintiff, a former stockholder and officer of the defendant company, and familiar with and connected with the matters embraced in the history of the case.

Mr. Frank H. Haskell testified that he was employed to make a preliminary survey of a proposed canal to connect the waters of the Santee and Cooper Rivers; Major Lee gave him the course; his instructions were to follow that course, run a straight line following the course. On page 108 of the Record we find:

"A. On the second day of the survey I became convinced of the impracticability of building it along that line and abandoned the work and came back to discuss the matter with Mr. G. A. Guignard. * * *

"Q. Major Lee was present? A. He was.

"Q. What happened as between you, Major Lee and Mr. Guignard? A. Major Lee refused to recede from his position and told me to run the line through and eventually we could develop the country more thoroughly using his line as a basic line, which was never done during my connection with them. * * *

"Q. Mr. Haskell, did you continue on with the Columbia Navigation Company? A. No, sir; I resigned.

"Q. Give any reason for your resignation? A. I was not satisfied with the location of the canal.

"Q. As engineer, will you state whether or not the location, as indicated, was practical in your opinion? A. In my opinion, it was not. * * *

"Q. Mr. Haskell, is there any point of similarity between the project as indicated by Major Lee and the present Santee-Cooper project as being constructed? A. No, sir; they are as different as they could possibly be."

Mr. C. Gadsden Guignard testified, page 121, Record:

"Q. Are you familiar with the plan as proposed by Major Lee? A. Yes.

"Q. What was that? A. He proposed a straight line from somewhere in the neighborhood of Ferguson on the Santee River to run this specific course, I have forgotten what it

was, to arrive at Mulberry Bluff on Cooper River, a little ways from Monck's Corner."

Mr. Guignard stated that he graduated in mechanical engineering and had taken some civil engineering. He discussed the proposed storage with Major Lee, but Major Lee would not consent to anything but a straight canal and would not consider a storage basin in between.

Mr. W. S. Murray testified that he is a member of the firm of Murray & Flood; they did some investigating and engineering work in connection with the Santee-Cooper project:

"Q. Mr. Murray, it is the testimony here that the so-called Lee plans for the Santee-Cooper project contemplated a straight line gravity canal from a point at Ferguson on the Santee to Mulberry Bluff on the Cooper, without a storage basin between the two rivers, will you state whether or not that is the plan as finally worked out by Murray & Flood? A. As I explained I had not seen then and have never seen the plan submitted by Mr. Lee but the plan as you describe it was not the Murray-Flood plan at all, we diverted the river, the Santee River, into a canal and that canal flowed into another reservoir formed by the dam to be built at Pinopolis, thereby making two locks, one in the above dam and the other at the rear end of the Pinopolis dam. * * *

"Q. Mr. Murray, did your firm or you have anything to do with the Federal Power license and the amendment thereof? A. Very much, it was by my own presentation to the Federal Power Commission that the success followed in permitting five hundred feet to be diverted instead of four thousand feet."

On cross examination, Mr. Murray said:

"Q. It is perfectly natural there should be changes in the plans of a project of this size over a period of years, isn't that true? A. When you say project, you will find in the beginning there was no project—

"Q. Call it proposed project— A. Our final plan was· development, that was not the original plan."

February 15, 1922, Major Lee wrote to G. A. Guignard, President, Columbia Railway & Navigation Company, a letter protesting the employment of Lockwood, Greene & Company to make a survey of the project, in which he said: "If you sent them on the survey, without informing them that I was your Chief Engineer then you did them a grievous wrong and a violation of your contract with me."

To this letter Mr. Guignard replied as follows:

"Your letter of February 15th received, enclosing a copy of blue-print map, which you state was made in 1914 for the Charleston company, and which you state shows that the location of the Canal with reference to. cost and reservoirs had been carefully considered. As a matter of fact, this map, and other maps which you have been very kindly sending to us, are of absolutely no value to our company or to the engineers who are making a report for us on the project now under consideration. The maps and surveys which you made for the Charleston company have reference to a project which was entirely abandoned when it was found that the engineers of the United States Army and the War Department refused to give their consent to its construction, and that Congress had failed to grant the necessary permission for the development. The project now under consideration is an entirely different proposition, and any surveys, designs, plans or estimates of costs made for the project which you had contemplated and which you had surveyed have absolutely no relation to the proposition upon which we are working, and can, therefore, be of no value to us.

"In addition to all of this, the little blue-print map which you inclose is incorrect, and is evidently not made from an actual recent survey. It shows a stream crossing the road from Monck's Corner to Biggins Bridge between the old canal and Monck's Corner. No such stream exists. I simply call your attention to this so that you may know the source

of information from which you prepared the old maps is full of inaccuracies and that it is simply a waste of time for you to make maps and estimates and other data which you have been forwarding to us from time to time from the information which you seem to have of that section.

"In reply to the last paragraph of your letter, and in defense of the charges which you make, I will say that Messrs. Lockwood, Greene & Company were furnished with the information contained in the report made by Mr. Verrill by direction of the Secretary of War, for which we paid; and with estimates, surveys and other data prepared by Mr. Betach, who was employed soon after it was definitely determined that the original project as outlined by you could not possibly be carried out because of the fact that the necessary consent of the Federal Government could not be obtained, and that our investigation had shown that it was not a practicable proposition and because it was not economically feasible. Therefore, Messrs. Lockwood, Greene & Company have committed no unethical act. As to my having committed a grievous wrong and a violation of contract by not informing them that you were Chief Engineer of the project, I am satisfied that the facts do not warrant your making such charge, and I do not think this admits of an argument.

"I wrote you under date of February 3rd. As yet I have received no reply to this letter, and I am at a loss to understand your attitude."

We have at great prolixity reproduced the testimony and this exhibit from the record because they completely refute two of the findings of the Circuit Decree to which exceptions are taken by appellant, viz.: That Major Lee in good faith did the things required of him, and that there was no basic difference between the project as licensed and the conception of Major Lee.

We are fully satisfied by the evidence that Major Lee did not fully perform his part of the contract. It is needless to epitomize the evidence. There can be no doubt that

Major Lee had no well-defined and complete plan for the construction of a canal as suggested, and that he did not turn any map, or profile or plan over to the navigation company upon which they could, within ten days after the signing of the contract, as required by its terms, begin immediately the work of securing all necessary rights-of-way, easements, etc., and to prosecute the same vigorously until the completion of its obligations thereabout. It is patent that in order to obtain necessary rights-of-way there must be a well-defined and determined line along which the land lies over which the desired rights-of-way and easements lie. It needs little more than a cursory inspection of the evidence and exhibits to determine that Major Lee never had and never turned over to the defendant any information, maps, estimates, and engineers' reports from which such line could be established.

There can be no doubt from the evidence that no plan, proposal, map or profile furnished by Major Lee was of any use in the construction of the canal as it is now being done. As Mr. Williams and Mr. Haskell, both able engineers, and Mr. Murray show the plans upon which the "project" is proceeding, it is different in every essential particular from any line, plan or project proposed by Major Lee.

The exceptions by the appellant to the Circuit Decree which challenge the holdings and conclusions that Major Lee fully complied with his contract, must be sustained, as must those exceptions which challenge the holding "that plaintiffs do recover of defendant, Columbia Railway & Navigation Company, the sum of Forty-seven Thousand Fifty-four and 35/100 ($47,054.35) Dollars, together with interest thereon at the rate of six per centum (6%) per annum from the 15th day of May, 1939. * * *."

It follows, of course, that if Major Lee did not fully comply with his contract, he is not entitled to receive the 10 per cent. of the price for which the project was sold.

We think and hold that Major Lee did furnish information, maps, etc., which put the navigation company on the road, and interested them in the project of a canal to unite the waters of the Santee and Cooper Rivers. But the data furnished by him was insufficient for the construction of such a canal. Up to the time of his death, March 12, 1922, very little of any importance had been done looking to the construction of such project. Nevertheless, he is entitled to some compensation.

Mr. Williams said, pages 54, 55 of the Record: "I don't say his survey was of no value and I didn't say that all of his studies were not of value—I didn't say in that letter nor have I ever thought that Major Lee's surveys, his studies and his plans were of no value but in arriving at the cost of the project, as I could see it, Major Lee's estimates would be of no consequence to me in that feature."

Elsewhere in his testimony, as is shown elsewhere herein, it is plain that Mr. Williams thought that Major Lee's plans were insufficient for the defendant to proceed with the work of construction without further investigation, plans and estimates. The inference is that he thinks that Major Lee's surveys, studies and plans were of some use to defendant and that he is entitled to some compensation. In that opinion we concur. What should be the measure of his compensation? Even before his death defendant had begun to employ engineers to make surveys and estimates of the project. In 1918, F. H. Haskell had been employed to make a survey. In the fall of 1921, Lockwood, Greene & Company were so employed. In the spring of 1923, Randolph Perkins Company reported on the project. In February, 1923, J. O. Wright, an engineer, made a report. In 1935, Murray & Flood made their report. All of these surveys and reports cost large sums of money, and the defendant incurred heavy and various other expenses and obligations in the furtherance of the work: To all of these expenses Major Lee contributed nothing and, of course, after his death in 1922 he performed no personal services in behalf of the project.

When the project was sold to the Authority in 1939, under the contract of sale the Authority assumed the payment of certain of the obligations of the company. It was provided that this amount should be determined by the administrator of the Federal Emergency Administration of Public Works, who was Hon. Harold C. Ickes, Secretary of the Interior in the Cabinet of the President of the United States. He fixed the amount at the sum of $419,544.21. To this sum is added the sum of $49,251.79, which added to the sum found by Mr. Ickes to be the amount paid by the Authority makes a total of $470,543.58. Mr. Ickes was acting under the following agreement, page 163 of the Record: "Pursuant to an agreement dated February 19, 1937, ('the Agreement') between the South Carolina Public Service Authority ('the Authority') and Columbia Railway & Navigation Company ('the Navigation Co.'), the Administrator was designated by the Authority and the Navigation Company to determine (1) 'an amount which will fairly and justly compensate the Company for all costs and expenses (excluding any profit to the Company), properly and legitimately incurred' in connection with the development of the so-called Santee-Cooper Hydro-electric and Navigation Project ('the Project') up to December 31, 1936, and (2) an amount which will reimburse the Navigation Company 'for all expenditures made or liabilities incurred by the Company in connection with the Project subsequent to December 31, 1936, and prior to the date of the transfer' of certain property by the Navigation Company to the Authority as specified in the Agreement.   *   *   * "

It will be seen that the Navigation Company reaped no profit by its sale of the Project. The Circuit Decree gives plaintiff judgment for $47,054.35, with interest at six per cent., which makes the sum of $49,407.06. This is practically the amount of the interest allowed the defendant on the sum of the expenses it had incurred and to which Major Lee contributed nothing, either in cash or in services.

This is a case in equity, and it is the province of the ■ Court to determine the amount which would compensate Major Lee for the partial performance of his part of the contract.

Practically all the Columbia Railway & Navigation Company received out of this transaction was the sum of $182,-700.00, which was paid to it for its capital stock, the license from the power commission and certain real estate interests by the International Land Corporation for the development of the project. The contract provides: "Fourth: The Columbia Railway & Navigation Company agrees that in event of the sale of the property and franchises, Major Lee shall receive as his compensation for the information turned over to the Columbia Railway & Navigation Company one-tenth (1/10) of the gross amount received from such sale, and in the event the Columbia Railway & Navigation Company, or its associates, shall develop the said canal the value of the property before development shall be determined by appraisement and Major Lee shall receive in money or other valuable considerations, one-tenth (1/10) of the value of said appraisement. The said moneys or other valuable considerations acceptable to Major Lee shall be turned over to him prior to the beginning of the work of development."

It seems clear that Major Lee foresaw that the com- ■ pany might sell out without completing the canal, in which event he was to receive one-tenth of the amount which they received. They did sell the assets of the company for which they received the sum of $182,790.00. In our judgment ten per cent. of this sum is a generous compensation for the information, maps, plans and engineer's reports turned over to the company by Major Lee and such services as he rendered to it before he died.

The plaintiffs have leave to enter judgment against the Columbia Railway & Navigation Company for the sum of $18,279.00, and the costs of the action.

MESSRS. JUSTICES BAKER, FISHBURNE and STUKES, and MR. ACTING ASSOCIATE JUSTICE L. D. LIDE concur.